### THE FRISIA AND THE JOHN N. PARKER.

*(District Court, E. D. New York.* February 16, 1885.)

COLLISION—STEAMERS CROSSING—RIGHT OF WAY—SPEED.

> A collision occurred in New York harbor in the afternoon of a clear day, between the steam-ship F., bound to sea on a S. S. W. course. and a bark which was in tow of the tug P., and proceeding from Red Hook towards Bedloe's island, on a N. N. W. course. *Held* that, as the vessels were on crossing courses, and the tug had the steamer on her starboard hand, the tug was charged with the duty of avoiding the steamer, and that the collision was caused by the fault of the tug in attempting to cross the steamer's bows; that on all the evidence there was nothing to charge the steamer with knowledge that the tug was intending to cross her bows until it was too late, and that no fault could be ascribed to the steamer; that it was not a fault for the steamer to proceed at the rate of 15 miles an hour on a clear day, when the harbor was not crowded.

In Admiralty.

*Jas. K. Hill, Wing & Shoudy,* for libelants.

*Butler, Stillman & Hubbard,* for the Frisia.

*Benedict, Taft & Benedict,* for the John N. Parker.

BENEDICT, J. This action is brought against the steam-ship Frisia, and the tug-boat John N. Parker, to recover the sum of $40,000 damages for the sinking of the bark James L. Harway, in a collision that occurred on the seventeenth day of June, 1882, in the harbor of New York. At the time of collision the bark was being taken by the tug upon a hawser from Red Hook to a place of anchorage off Bedloe's island. The tide was ebb, and the course of the tug and bark, after passing the buoy below Governor's island, was N. N. W. At the same time the steam-ship Frisia was bound to sea from her pier at Hoboken, and was proceeding down along the west shore of the channel upon a S. S. W. course. The steam-ship and the tug were therefore approaching each other upon crossing courses, and the tug having the steam-ship on her starboard side, as soon as danger of collision arose, became charged with the duty of avoiding the steam-ship. It was a

[1] Reported by R. D. & Wyllys Benedict, of the New York bar.

clear day. The vessels were in plain sight of each other, and neither tug nor steamer was embarrassed by the movements or position of any other vessel. The harbor was substantially clear, and there was abundant room for the tug to pass ahead or astern of the steam-ship, as she might be advised. Judging that she could cross the steamer's course ahead of her, the tug made no change of course, but quickened her speed as the steam-ship approached nearer. The tug herself succeeded in passing the steamer's bows, but the bark was struck by the steam-ship.

I have no hesitation in finding this collision to have been caused by fault of the tug in attempting to cross the steamer's bows. The bay being clear, and the tide ebb, there would have been no difficulty whatever in the tug's bearing up head to the tide and allowing the steam-ship to pass ahead of her. Instead of adopting this safe course, the tug concluded to attempt to cross the steamer's bows, when, as the result showed, it was impossible for her to do so. The attempt was, obviously, hazardous, and wholly unnecessary. Having attempted a hazardous maneuver when a safe course was open to her, and having failed, she must pay the damages resulting from her failure. Whether the steam-ship was not also in fault is the next question. Notwithstanding the obligations resting upon the tug to avoid the steamer, it was the duty of the steamer, as soon as it become apparent to her that the tug had selected a course calculated to bring the vessels in contact, to do all in her power to prevent collision. If the account given by those on board the tug could be taken to be true, doubtless the steamer would be condemned; for, according to their account, the steamer was given timely notice, by whistles from the tug, that the tug intended to cross ahead of the steamer. But, in fact, the tug's whistles were not blown until the steamer was close upon her. One witness from another vessel, called in behalf of the tug, shows that the tug, although moving at a speed of six knots, ran only about her length between the time of the first whistle and the last whistle from the tug, and the last whistle was at the instant of collision. The testimony of other witnesses also makes plain the fact that all the whistles from the tug were blown when the steamer was so close at hand that stopping and reversing her engine was the only thing then to be done by the steamer towards avoiding a collision.

The reason why the tug did not sooner inform the steamer of her intention to cross the steamer's bows is manifest. The master of the tug, as he frankly said upon the stand, believed, up to the very blow, that he could take the bark across the steamer's bows in safety, without calling on the steamer to do anything. Consequently, he did nothing to warn the steamer of his intention to insist upon crossing her bows until he discovered that he was in danger. Then, indeed, he blew to the steamer, and quickened his speed, and then the steamer stopped and reversed, but it was too late. The steamer cannot, therefore, be held responsible for the collision, unless it can be found that

in the absence of signals from the tug to that effect the steamer was, nevertheless, chargeable with knowledge of the tug's intention to attempt to cross her bows. If, notwithstanding the omission of the tug to give timely notice by her whistle, the circumstances were such as to inform the steamer in time that the tug was intending to cross her bows, such circumstances cast upon the steamer the duty, by a timely change of her course by slacking of her speed, to avoid the danger attending the course selected by the tug. I find in the circumstances proved nothing calculated to convey such information to the steamer. The steamer was on a course down the bay, on the western side of the channel. The tug came into the channel on the east side, below the buoy at Governor's island. Her destination was unknown to the steamer. The tide was ebb; the tug headed up against the tide about N. N. W. She had a bark in tow, upon a hawser 60 fathoms long. She could, at any moment, bring herself and her tow quickly head to the tide. The steamer's approach was plainly to be seen, and the tug gave no signal in regard to her course. I find nothing in these circumstances that would inform the steamer of the tug's intention to cross her bows. That intention was not disclosed until manifested by the near approach of the tug to the steamer's course without change. Then the steam-ship stopped and reversed, and in so doing she discharged all her duty; for she could then do nothing more to avoid collision.

It should also be remarked that the steamer furnishes testimony from her pilot and her chief officer that by her whistle she gave to the tug timely notice that it was the steamer's intention to keep her course down the west side of the channel. The witnesses for the bark and tug say they heard no such signal. Their failure to observe this signal may be attributed to the fact that their attention was bestowed upon an Inman steamer which passed up the bay from below, while the Frisia was approaching from above, and crossed the tug's bows before the tug reached the course of the Frisia. The master of the tug says this Inman steamer passed his bows after he had blown to the Frisia. But in this he is mistaken. The Inman steamer passed him before that, and her proximity may have been the reason why the Frisia's signals were not observed. The statements of those on the tug that no signals were given by the Frisia have therefore failed to satisfy me that the pilot and chief officer of the Frisia testify untruly in this particular. Their testimony, if believed, leaves no room to impute fault to the Frisia.

It has been urged against the Frisia as a fault that she was going at 15 miles per hour. If that was her speed it was no fault. The day was clear. The harbor was not crowded. There was abundant room, and at 15 miles an hour the Frisia could easily have avoided the bark, if she had been duly informed of the tug's intention to attempt to cross the steamer's bows. No lookout is also charged upon the steamer. But the tug was seen, and closely watched, by the pilot

and the chief officer of the steamer.    No neglect of the lookout, there-
fore, contributed to cause the disaster.    I find no ground, therefore,
upon which to hold the Frisia responsible for the collision in question.

The libel as against the Frisia must therefore be dismissed, with
costs, and a decree entered against the tug for the amount of the
damages resulting to the libelant from the collision between the bark
and the steamer.